FRÉDERICK FREIBERG *et al.* .

*v.*

THE SOUTH SIDE ELEVATED RAILROAD COMPANY.

*Opinion filed April 17, 1906—Rehearing denied June 7, 1906.*

1. EMINENT DOMAIN—*owner of fee and owner of leasehold are not both entitled to three jury challenges.* The owner of the fee and the owner of the leasehold therein are but one party and are together entitled to but three peremptory challenges, and if the court allows them three, each, they cannot complain, on appeal, that the court allowed the petitioner six.

2. SAME—*damages cannot be allowed for removing elevated station.* Damages to property not taken in condemnation by an elevated railroad cannot be allowed because of the proposed removal of the station, which adjoins such property, to the opposite side of the street, nor because the petitioner intends to operate on one of its tracks express trains which will not stop at such station.

3. SAME—*what is not a proper question as to damage to property not taken.* Where one floor of a building, which stands on the land condemned and which must be torn down, is used in connection with another building as a hall, known as "Freiberg Hall," it is not proper to ask witnesses what effect, in their opinion, "the tearing away of the annex that is attached to the Freiberg Hall will have upon the Freiberg Hall," since the question should relate to the effect upon the fair cash market value of the real estate.

4. SAME—*the "highest and best use" means from a financial standpoint.* The "highest and best use" of the property condemned means from a financial standpoint and not from a moral one, and if the evidence shows that such best use is for a saloon and dance-hall, the petitioner is not entitled to show, in rebuttal, that the saloon and dance-hall is conducted in an unlawful manner.

5. SAME—*basis of value for land taken.* Defendants to condemnation are entitled to receive the highest cash market price, based on its most valuable use, that could be obtained for the land on the day the petition was filed, and the fact that the value of the property has been increased in the eyes of possible purchasers by a business conducted in an unlawful manner by a tenant in the building on the land, either with or without the connivance of the owner, is immaterial.

6. SAME—*instruction conveying impression that defendants are violaters of law is erroneous.* In condemnation, where the evidence shows that the most valuable use of the property condemned is for a saloon and dance-hall, an instruction holding that no official of

the city has a right to permit any person to violate the law, and that if the jury believe the defendants have violated the law, they have no right to justify the conduct of the defendants upon the ground that it has been tolerated or permitted by the officials, is misleading and erroneous in tending to prejudice the jury against defendants.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This is an appeal by the property owners from a judgment of condemnation rendered by the superior court of Cook county in a proceeding instituted by appellee. The petition was filed on January 10, 1905. The property involved is lot 10, which is forty-eight feet in width, and the east sixteen and one-quarter feet of lot 11, in block 28, in a certain subdivision in the city of Chicago. The property has a depth of two hundred feet. Lot 11 lies west of lot 10, and the property faces south on Twenty-second street between Wabash avenue and State street, in the city of Chicago. The elevated structure of the appellee at present extends past this property on the west side, and the realty owned by the appellee upon which that structure is erected immediately adjoins the property involved in this suit.

In this proceeding the railroad company seeks to condemn the west fifteen feet of the property above described for the purpose of making a three-track structure out of its present two-track structure. Of this fifteen feet, the west nine feet and six inches had been acquired by appellee, by condemnation, in 1891, and afterwards, in 1892, appellee conveyed to Frederick Freiberg and Mary Freiberg, then and now the owners of the other property involved in this suit, a perpetual right of user of that nine feet and six inches, subject to certain restrictions as to the style of buildings that should be erected thereon. In this proceeding the railroad company condemns the interest it had conveyed to the Freibergs in that nine feet and six inches of lot 11, and also a strip five and one-half feet wide next east of it, the fee of which is in the Freibergs. This makes in all a strip fifteen

feet in width and two hundred feet in length, and leaves in the Freibergs the east one foot and three inches of lot 11, and all of lot 10, forty-eight feet in width, lying immediately east of the strip of one foot and three inches.

Lot 10, for approximately thirty years, has been occupied by a brick building, four stories in height and one hundred and ninety-five feet in depth and the full width of the lot, known in this record as the "old building." On the east sixteen feet and three inches of lot 11, fifteen feet of which is taken in this proceeding, there is a four-story brick and stone building covering the entire width of the strip of sixteen feet and three inches and running back a depth of thirty-seven feet, hereinafter referred to as the "thirty-seven-foot building." Immediately back of this thirty-seven-foot building and extending to the rear line of the lot, and being sixteen feet and three inches in width, is a one-story building built of brick, known herein as the "lean-to." The passenger station of the appellee on the north side of Twenty-second street immediately adjoins this thirty-seven-foot building on the west. The lean-to and the thirty-seven-foot building were used in connection with the old building, arches and other openings having been cut through the wall of the old building, and the entire structure was commonly referred to as "Freiberg's Hall." On the first floor was a saloon and restaurant, with a dance-hall in the rear, which was reached by a hall running through the center of the old building from the front and separating the saloon from the restaurant. The upper stories of the building were used as flats, lodge halls, club rooms and gymnasiums. The dance-hall and saloon, including the lean-to, the first floor of the thirty-seven-foot building, and the basement, are leased to and occupied by one Isaac Gittelson, sometimes called Bloom, at an annual rental of $4000 per annum. The term of his lease began February 1, 1902, and expires April 30, 1907. Gittelson was a respondent, and the damages to his leasehold interest were fixed, and he did not appeal.

Frederick Freiberg, one of the owners of the property, is a musician, living in Chicago. He is at the head of Freiberg's orchestra, which furnishes the music for the dance hall. The other owner, Mary Freiberg, is the widow of his deceased brother, and resides at Mt. Vernon, New York.

The jury returned a verdict awarding to Gittelson, as damages, the sum of $2150, and to the Freibergs the sum of $15,450 for property taken, and nothing for damages to property not taken. The Freibergs moved for a new trial, which was denied and judgment was entered, whereupon they appealed. They assign as error the action of the court in allowing appellee more than three peremptory challenges in the selection of the jury, in admitting and excluding evidence, and in giving, modifying and refusing instructions.

D'ANCONA & PFLAUM, for appellants.

FRANCIS W. WALKER, and EDWARD C. NICHOLS, (NOBLE B. JUDAH, of counsel,) for appellee.

Per CURIAM: In the trial of this case, Gittelson, *alias* Bloom, and the Freibergs, contended, and the court held, that Gittelson was entitled to exercise three peremptory challenges and that the Freibergs were entitled to use a like number, and, over the objection of the respondent, the petitioner was then permitted to exercise six peremptory challenges. This was an error of which appellants may not avail themselves. The suit was a condemnation of one piece of property where the leasehold was held by Gittelson, and the property subject thereto was held by the Freibergs. Under such circumstances the petitioner was one party to the suit and the other party was composed of Gittelson and the Freibergs. The respondents were entitled to but three peremptory challenges in the aggregate, and the petitioner was entitled to the same number only. (*Cadwallader* v. *Harris*, 76 Ill. 370; *Schmidt* v. *Chicago and Northwestern Railway Co.* 83 id. 405; *Illinois, Iowa and Minnesota Railway Co.*

v. *Freeman,* 210 id. 270.)   Had there been twenty tenants seeking damages, each holding by a separate lease, appellants' argument would lead to those tenants being permitted to exercise sixty challenges while the petitioner could use but three, and that, manifestly, would not.accord with the intent of the statute.   The appellants having profited by the court's erroneous holding that each party was entitled to six peremptory challenges, may not have the judgment reversed for that error.

Appellee introduced evidence tending to show the value of the property taken; and establishing the fact that its purpose was to move the Twenty-second street station from its present location, adjoining the Freiberg property, to the opposite side of the street, and that the object in erecting a structure for a third track was to provide an express service between Twelfth and Forty-third streets; that the express trains would run at a maximum speed of forty miles an hour and would not stop at Twenty-second street, while the average speed of the present local trains is thirteen miles an hour. Appellants, for the purpose of showing damages to property not taken, endeavored to show what the effect would be, on the value of that property, of the removal of the station and the operation of express trains at the rate of forty miles per hour from Forty-third street to Twelfth street without a stop. This evidence was immaterial. The railroad company is under no obligation to appellants to continue this Twenty-second street station in its present place, and has the right, so far as· the Freibergs are concerned, to operate express trains upon its present structure at the rate of forty miles an hour without stopping at Twenty-second street.   The question whether increased noise and vibration, if any, attendant upon the operation of trains in increased number and over three tracks instead of over two tracks should be taken into consideration in determining whether the value of the property not taken will be depreciated, is not presented by this record.

The taking of the fifteen feet condemned would necessitate tearing down the thirty-seven-foot building and the lean-to, and would leave one foot and three inches of ground between that condemned and the old building, and leave open archways in the wall of the old building that now lead from the dance-hall in the old building to the space in the lean-to. Appellants insist vehemently that the court erred in sustaining objections to many questions propounded by them, each of which was, in substance, as follows: "What effect, if any, in your opinion, will the taking away of this annex that is attached to the Freiberg Hall have upon the Freiberg Hall?" Such questions are manifestly improper. The interrogatory should be designed to elicit an answer stating what the effect will be upon the fair cash market value of the real estate not taken.

It appeared in the course of taking testimony offered by appellants that the highest and best use to which the property leased by Gittelson was adapted was for use as a saloon and dance-hall. For example, among other witnesses called by appellants was Frank Riedle, who, so far as we can judge from the abstract of the testimony, was a fair and intelligent witness, well qualified to testify in regard to matters about which he spoke. His evidence was, that the value of the entire Freiberg property that would be taken, as well as that not to be taken, was $900 per front foot for the fee simple title, but that the nine feet and six inches on the west, where there was a restriction upon the title, would be worth one-third less on account of that restriction, and that the taking of the fifteen-foot strip and the removal of the buildings thereon would depreciate the value of the property not taken thirty per cent. On cross-examination he testified that if the occupant of the property was unable to obtain permits to conduct a saloon and dance-hall the property would be worth about $750 per front foot. The term "highest and best," as used in this connection, means highest and best in a financial sense. Counsel for appellee and the court below, however,

221—33

proceeded on the theory that it meant highest and best from the standpoint of the moralist, and in rebuttal appellee was permitted to offer evidence which tended to show that the saloon and dance-hall were conducted in an unlawful manner; that the dances began at eight o'clock in the evening and ran until four in the morning; that whisky and other intoxicants were sold to the patrons after the closing hour as fixed by the city ordinance; that dances took place on the main hall floor and that the lean-to was used as a place to serve drinks, where men who were consorting with the women that resorted to this place might be concealed from public gaze; that the dances were ordinarily attended by about two hundred and fifty persons, each paying an admission fee of twenty-five cents; that one-half of the number would be women, two-thirds of whom were prostitutes and the others of disreputable character; that women who resorted to this dance-hall used it as a place of assignation, soliciting and inducing men to drink to swell the profits of the house; that they accompanied men from the dance-hall to rooms in the vicinity, and back again, throughout the evening; that minors, both male and female, were permitted in the hall and served with drinks at the tables until early morning; that during the time the dance continued Frederick Freiberg frequently led the orchestra which furnished the music. Witnesses who testified for appellee were permitted to describe at great length, with most elaborate detail, lewd and improper conduct, extending over several hours, of persons dissipating in this hall, and to recite lascivious proposals made and indecent invitations extended by women to men, and to relate negotiations which took place between these men and women. Evidence was also admitted to show that the saloon was being conducted without the proper license at the time of the trial, although it was operated by virtue of a dram-shop license regularly issued, when the petition was filed. Ordinances of the city of Chicago, which the appellee claimed had been violated by the manner in which the saloon

and dance-hall was conducted, were admitted in evidence. The purpose apparently was to show that the value of the property had been increased by the illegal and improper manner in which the business had been conducted, although the record is barren of any evidence which indicates that the value of the property was any greater on account of the fact that the saloon and dance-hall had been conducted in an unlawful manner than it would have been had they been conducted in a lawful manner. Neither a saloon nor dance-hall is illegal *per se*. The position of court and counsel for the appellee was that appellants could only have their damages fixed upon the basis of the value that the property would have if a lawful business was carried on there in a lawful manner.

This petition was filed on the 10th of January, 1905. In contemplation of law the fifteen-foot strip was taken by appellee on that day. For that strip appellants are entitled to receive the highest cash market price that could be obtained therefor, and they are entitled to have that value fixed on the basis that the property is to be sold for the highest and best use to which it is adapted,—that is, the use which makes it the most valuable. The fact that the value of the property had been increased, in the eyes of possible purchasers, by a business conducted in an unlawful manner in a part of the building by a tenant, either with or without the connivance of the owners, and that the purchaser on that account would regard the property as of greater value, is wholly immaterial. That does not concern the railroad company. If appellee's view of the law was correct, the result would be that it could have taken appellants' property on January 10, 1905, for a lesser price than they could obtain for it from some one else, and could take it for that lesser price because appellants had not prevented their tenant from conducting his business in an unlawful manner, or because that business had been carried on in the way it was with their tacit consent. To state the proposition is to condemn it. We find no authority cited in

appellee's brief to sustain the superior court in the position taken by it in this regard. If appellants have been guilty of a violation of the statutes and ordinances, it is not in this suit that the penalties may be inflicted. If these persons offend they should be prosecuted and punished, but the law governing persons, natural or artificial, who desire to possess themselves of the property of the Freibergs will not on that account be modified or suspended. This corporation, exercising the power of eminent domain, will not be permitted to take appellants' property from them without making just compensation, even if they have violated the laws both of city and State.

Counsel for appellee have evolved an ingenious theory by which they seek to make it appear that the value of the property taken, if that taken be considered and its value fixed as a part of the entire real estate, includes all damages occasioned by the narrowing of appellants' realty that would be sustained by the land not taken. This view is embodied in the first instruction given on the part of petitioner, which is in the words following:

"The court instructs the jury, that if they believe, from the evidence in this case, that the fifteen feet of ground sought to be taken by the petitioning railroad, with the restrictions on the nine and one-half feet shown by the evidence the fee of which is in the railroad, is worth more in the market per front foot as part of the whole tract extending east from the present elevated railroad right of way to the alley east of the Freiberg property on Twenty-second street than said fifteen feet would be worth with the restrictions of the nine and one-half feet aforesaid in a separate and distinct owner and not connected with the other Freiberg ground, and if they further believe, from the evidence, that the fair cash market value of said fifteen feet of ground sought to be taken, with the restrictions on the nine and one-half feet thereof aforesaid, as used in connection with the whole tract of ground as aforesaid, is all there is of value or damage to

the whole tract, then they should allow such figure for the fifteen feet sought to be taken, as aforesaid, its fair cash market value as part of the whole tract, and no damages to the remainder in that event by reason of the narrowing of the tract of ground."

This instruction is both inaccurate and misleading. By it a very simple proposition is made so confusing that the ordinary juror could not understand it without great difficulty. The only statement of the law covered by that instruction which appellee was entitled to have given to the jury is this: The owners are entitled to the fair cash value of the property taken, estimating its value in connection with adjoining realty owned by them, or estimating its value separately if its value is greater separately, and if the realty not taken is not depreciated in value by reason of the property owned by respondents being narrowed, then no damages should be allowed to property not taken on account of the narrowing of respondents' property. That proposition, however, is lost in the waste of words contained in the instruction.

In addition to the value of the part taken, appellants are entitled to obtain any depreciation in the fair cash market value of the real estate not taken which is occasioned by the taking of the fifteen-foot strip and the consequent narrowing of their property, or any other injury to the remainder of their property occasioned by the taking of the fifteen-foot strip and the construction of appellee's additional structure and the operation of additional trains, if any. For instance, upon the basis of Mr. Riedle's testimony, as to the correctness of which we express no opinion, appellants would be entitled to recover for the property taken $900 per front foot, or $13,500, less the deduction of one-third for the east nine and one-half feet, which would be $2850, and leave for property taken $10,650, and in addition thirty per cent of $900 per front foot for damages to the property not taken. The jury found no damages to property not taken, notwithstanding the fact that the taking of the fifteen-foot strip, and

the consequent narrowing of the property owned by appellants, will leave a strip one foot and three inches in width between the railroad right of way and the old building which will be practically useless so long as the old building stands. There was no pretense that any special benefit would be conferred upon any of the property not taken. We are constrained to believe that the jury were misled by the instruction which is above set out.

The seventh instruction given at appellee's request reads:

"The court instructs the jury, as a matter of law, that no public official of the city of Chicago, no matter how exalted his position may be, has a right to permit any person to violate the laws of the State or the ordinances of the city of Chicago; and if they believe, from the evidence in this case, that either Mr. Freiberg or Mr. Bloom have broken or violated the said laws or ordinances, and that some city official failed to enforce the laws and ordinances as against said Freiberg or said Bloom, the jury have no right to justify any such infraction of the laws or ordinances of the city of Chicago, if they believe, from the evidence, any such laws or ordinances have been violated, although they may further believe, from the evidence, that any of the public officials of the city of Chicago tolerated or permitted any such infraction of the law."

Counsel for appellee seek to uphold this instruction by stating that during the trial counsel for respondents made some attempt to justify Freiberg and Gittelson in violating the ordinances and the law by showing that their wrongdoing had been permitted, at least by negative toleration, by the public authorities. The abstract seems to furnish no warrant for this statement of counsel for appellee, but if it did, the instruction would still be erroneous. The course pursued by the public authorities of the city of Chicago was not a proper subject for investigation in this cause. The only effect of such an instruction would be to prejudice the jury against respondents by conveying to the jury the impression

that respondents were violators of the law, for whose conduct there could be neither excuse nor palliation.

The fifth instruction given at the request of appellee is:

"The court instructs the jury to disregard all values given, if any have been given, for the highest and best use of the respondents' property in this case, where such highest or best use may have been unlawful or in violation of the ordinances of the city of Chicago in evidence in this case."

For reasons already suggested this instruction is erroneous.

Instructions requested by appellants were modified to make them conform to the proposition stated in appellee's fifth, above set out. Each and every of such modifications was wrong.

Other errors are found in the record. As they will probably not occur on another trial of the cause we will not discuss them.

In order that appellants may have a trial in accordance with the law of this State in reference to proceedings in eminent domain, the judgment of the superior court will be reversed and the cause will be remanded.

*Reversed and remanded.*